IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JESSICA HOLMES,<br><br>              Petitioner,<br><br>vs.<br><br>DEBORAH K. JOHNSON, Warden,<br>Central California Women's Facility,[1]<br><br>              Respondent. | No. 2:11-cv-2710-JKS<br><br>MEMORANDUM DECISION |

Jessica Holmes, a state prisoner represented by counsel, filed a Petition for a Writ of Habeas Corpus with this Court pursuant to 28 U.S.C. § 2254. Holmes is in the custody of the California Department of Corrections and Rehabilitation and incarcerated at the Central California Women's Facility. Respondent has answered, and Holmes has replied.

I. BACKGROUND/PRIOR PROCEEDINGS

During a two-week period in 2005, Holmes and her boyfriend, Corey Schroeder, along with Joseph Johnson, robbed or attempted to rob at least five gas stations in the Sacramento area. Schroeder would case the station, Johnson would rob the station attendant at gunpoint, and Holmes would drive them away. During the group's final attempted robbery, Johnson shot and killed the station attendant, Prem Chetty.

Holmes and Johnson were tried in a unitary trial with separate juries; Schroeder's trial was severed from Holmes's and Johnson's trial. Prior to trial, Holmes moved to exclude statements she made to law enforcement during interrogation on the grounds that she did

---

      [1] Deborah K. Johnson, Warden, Central California Women's Facility, is substituted for Walter Miller, former Warden, Valley State Prison. FED. R. CIV. P. 25(c).

not knowingly and voluntarily waive her *Miranda*[2] rights and the admission of her statements at trial would violate California Evidence Code § 352. The trial court held a hearing on the motion where Holmes's counsel stated, "[W]e're not contending that the *Miranda* advisements weren't given or weren't given properly. I think once you look at the transcript, once you watch the video, I think it's clear that they did read the *Miranda* advisements directly from the card and I think they are adequate." Counsel instead claimed that Holmes did not waive her *Miranda* rights because she gave no express waiver, the "tone of the interrogation" had become coercive during the interrogation, Holmes had been under the influence of methamphetamine, and she could hear Schroeder in an adjacent interview room. The trial court ultimately concluded that the detectives' interrogation of Holmes "was noncoercive and it was compliant in every respect with the terms and provisions of *Miranda* . . . ." The prosecution then played a redacted videotape of Holmes's interview to her jury during the prosecution's case-in-chief.

At the conclusion of trial, the jury found Holmes guilty of murder occurring during the commission of an attempted robbery, two counts of attempted robbery, and three counts of robbery. The jury also found true gun-use enhancements and principal-armed enhancements as to each count. The trial court sentenced Holmes to state prison for life without possibility of parole ("LWOP") for the special-circumstance murder plus a determinate term of eight years and eight months for the remaining convictions and enhancements.

Following sentencing, Holmes moved for the court to reconsider its sentence on the ground that her LWOP sentence violated the state and federal constitutional provisions against

---

[2]     *See Miranda v. Arizona*, 384 U.S. 436 (1966).

cruel and/or unusual punishment. After hearing arguments from both parties, the court denied Holmes's motion.

Through counsel, Holmes appealed her conviction, arguing that 1) the trial court should have granted her motion to suppress her confession because the *Miranda* warning was inadequate and she did not voluntarily, knowingly, and intelligently waive her constitutional rights; and 2) her LWOP sentence constituted cruel and/or unusual punishment. The California Court of Appeal modified the custody credit she received but otherwise affirmed the conviction. The California Supreme Court denied Holmes's petition for review on July 16, 2010.

Holmes then filed a *pro se* petition for a writ of habeas corpus to the Superior Court, claiming that: 1) the trial court made a "prejudicial and unfair statement" that violated her right to a fair trial and impartial jury; 2) the trial court failed to instruct the jury that voluntary intoxication could negate the specific intent required for the crime of robbery; 3) the prosecutor impermissibly "urge[d] the jury to use character trait evidence in an improper use"; 4) her trial counsel rendered ineffective assistance by advising her to reject the plea deal, failing to "explore all potentially meritorious defenses, recommending that she not testify, and failing to object to the prosecution's use of character evidence; 5) prosecutorial misconduct in "inject[ing] personal opinion about evidence, guilt, a witness's credibility, and a defendant's guilt"; 6) the trial court committed reversible error by failing to sever her trial from Johnson's; 7) the trial court erred in allowing certain witnesses to testify in front of her jury about evidence that was not relevant to her case; and 8) the prosecutor committed reversible error by failing to show the original version of a videotape and failing to produce the original tape to Holmes. The Superior Court denied the petition in a reasoned opinion. Holmes raised the same claims in a petition for a writ of habeas

3

corpus to the Court of Appeal, which was summarily denied. Holmes then raised the same claims in a petition to the Supreme Court, which was denied without comment on August 10, 2011.

Holmes timely filed a Petition for a Writ of Habeas Corpus to this Court on October 13, 2011.

## II. GROUNDS/CLAIMS

In her counseled Petition, Holmes asserts three grounds for habeas relief. First, Holmes argues that the statements she made to law enforcement should have been suppressed because she did not validly waive her right to remain silent. Holmes next claims that her LWOP sentence constitutes cruel and unusual punishment. Finally, Holmes contends that her trial counsel was ineffective for advising her to decline a plea offer and to not testify.

## III. STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d), this Court cannot grant relief unless the decision of the state court was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," § 2254(d)(2). A state-court decision is contrary to federal law if the state court applies a rule that contradicts controlling Supreme Court authority or "if the state court confronts a set of facts that are materially indistinguishable from a decision" of the Supreme Court, but nevertheless arrives at a different result. *Williams v. Taylor*, 529 U.S. 362, 406 (2000).

The Supreme Court has explained that "clearly established Federal law" in § 2254(d)(1) "refers to the holdings, as opposed to the dicta, of [the Supreme Court] as of the time of the relevant state-court decision." *Id.* at 412. The holding must also be intended to be binding upon the states; that is, the decision must be based upon constitutional grounds, not on the supervisory power of the Supreme Court over federal courts. *Early v. Packer*, 537 U.S. 3, 10 (2002). Where holdings of the Supreme Court regarding the issue presented on habeas review are lacking, "it cannot be said that the state court 'unreasonabl[y] appli[ed] clearly established Federal law.'" *Carey v. Musladin*, 549 U.S. 70, 77 (2006) (citation omitted).

To the extent that the petition raises issues of the proper application of state law, they are beyond the purview of this Court in a federal habeas proceeding. *See Swarthout v. Cooke*, 131 S. Ct. 859, 863 (2011) (per curiam) (holding that it is of no federal concern whether state law was correctly applied). It is a fundamental precept of dual federalism that the states possess primary authority for defining and enforcing the criminal law. *See, e.g.*, *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (a federal habeas court cannot reexamine a state court's interpretation and application of state law); *Walton v. Arizona,* 497 U.S. 639, 653 (1990) (presuming that the state court knew and correctly applied state law), *overruled on other grounds by Ring v. Arizona*, 536 U.S. 584 (2002).

In applying these standards on habeas review, this Court reviews the "last reasoned decision" by the state court. *See Robinson v. Ignacio,* 360 F.3d 1044, 1055 (9th Cir. 2004) (citing *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002)). Under the AEDPA, the state court's findings of fact are presumed to be correct unless the petitioner rebuts this presumption by clear

5

and convincing evidence. 28 U.S.C. § 2254(e)(1); *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

## IV. DISCUSSION

Claim One: Motion to Suppress

Holmes first argues that, "although the *Miranda* warnings effectively advised [her] she had a right to remain silent and to have counsel present, the evidence is clear that as a result of the officer's questionable tactics [Holmes] was and [sic] actively misled into unaware [sic] that she also had the right to refuse further questioning." She further asserts that, if there was a waiver, "it was coerced, obtained by trickery and deceit and thus, outside of *Miranda*."

In considering this claim on direct appeal, the appellate court summarized the following underlying facts:

> Holmes was interviewed by two sets of Sacramento County Sheriff's detectives on July 11, 2005. The first set, Detectives Robin Kolb and Daniel Cabral, began their interview around 5:45 p.m. They obtained preliminary information and thanked Holmes for coming to the station to talk with them. They provided the *Miranda* warning as follows:
> 
> DET. KOLB: Um, anyway, we want to ask you some questions.
> 
> J. HOLMES: Uh-huh.
> 
> DET. KOLB: You probably have some questions that you want to ask us. And so we want you to just feel free to speak freely. You know, don't be afraid to ask any questions.
> 
> J. HOLMES: Okay.
> 
> DET. KOLB: There aren't any stupid questions, you know that.
> 
> J. HOLMES: Uh-huh.
> 
> DET. KOLB: Um, but before we get into that we have to-to clear the technicality. We have to (Unintelligible) you constitutional rights.

J. HOLMES: Uh-huh.

DET. KOLB: Which we refer to that as (Unintelligible) rights?

J. HOLMES: Yeah.

DET. CABRAL: Okay.  What I'm going to be doing—I'm going to read—I'm going to read those off and then based off of this we can talk, okay?

J. HOLMES: Uh-huh.

DET. CABRAL: Um, you have the right to remain silent, anything you say can be used against you in a court of law.  You have the right to talk to an attorney and have an attorney present before and during questioning.  If you cannot afford an attorney one will be appointed free of charge to—to represent you before and during questioning if you desire.  Do you understand each of these rights I've explained to you?

J. HOLMES: Yes, I do.

DET. CABRAL: Okay[.]

DET. KOLB: (Unintelligible)?

DET. CABRAL: (Unintelligible).

DET. KOLB: You probably can say it better than he just said, huh?

DET. CABRAL: A lot of people know it by heart.  So you know a lot of people know them by heart.  Um, having those rights in mind and, we—you know, of course we want to talk to you about everything that's—that's come up in this case—

J. HOLMES: Uh-huh.

DET. CABRAL:—that we've been working on.  So, um, let's just start off, you—what do  you know of Joseph—Joseph's involvement in things that he's been doing?

J. HOLMES: Um, I just found out today through [Johnson's cousin] that he was the one that was in the newspaper.  That I saw in the newspaper a couple of days ago that some guy got shot off of Greenback and Auburn.

      The detectives continued to ask Holmes about her involvement in the gas station robberies.  Holmes answered the questions freely, and she eventually admitted her involvement in the Shell station murder and three or four additional robberies.  She stated she did not know Johnson had killed anyone until the detectives informed her in this

7

interview. She also claimed she did not know Johnson had robbed anyone until after the robberies occurred. Her interview with Detectives Kolb and Cabral lasted about 50 minutes, ending around 6:35 p.m.

About two hours later, Detectives Paul Biondi and Ken Clark entered the room and began asking Holmes additional questions about her involvement in the gas station robberies. Detective Biondi challenged Holmes's assertion that she did not know Johnson was going to rob a gas station even though he asked her to park in strange spots before he went inside. Holmes, however, consistently denied knowing of Johnson's intent beforehand. This interview lasted about 30 minutes.

After the detectives left, Holmes and Schroeder, who was in the adjoining interview room, talked to each other through the wall. A detective returned and informed Holmes she was being charged with murder and attempted robbery. Holmes and Schroeder continued talking to each other through the wall until some minutes later when Holmes was removed from the room.

The appellate court ultimately concluded:

Our review of the record and the totality of the circumstances surrounding Holmes's statement leads us to conclude she impliedly waived her *Miranda* rights when she spoke with the detectives. During her interrogation, she stated she understood her *Miranda* rights. There was no indication she did not understand her rights. She was 18 years old, a high school graduate, and was able to understand and respond to all of the questions posed to her. There also was no evidence that Holmes was under the influence of drugs or alcohol at the time of the interviews.
  Holmes knew she was free not to speak and could obtain an attorney, and she knew if she spoke with the detectives her remarks could be used against her in court. Yet she spoke with the deputies freely and did not refuse to answer their questions. She did not request an attorney or ask that the questioning stop. These circumstances demonstrate Holmes impliedly waived her *Miranda* rights by her continuing participation in the interrogations.
  Holmes argues any implied waiver was invalid because the interviewing detectives minimized the significance of her rights, used deceptive tactics and false statements to get her to talk, and became aggressive and sarcastic to force her to talk.
  Specifically, Holmes asserts Detectives Kolb and Cabral unduly minimized the significance of her rights by referring to them as "clear[ing] a technicality," describing the interview as a chance for Holmes to get answers, encouraging her to talk freely and to ask any questions, not telling her the statements "will" be used in court, and by not asking her if she wished to waive her rights.
. . .
  The detectives did not misrepresent the significance of Holmes's rights. Referring to the process as clearing a "technicality" and encouraging Holmes to talk and ask questions did not minimize the significance of her rights or the risks of her speaking

8

with detectives.  Holmes understood her rights and answered all of the detectives' questions with knowledge of her rights.  She knew she was there to discuss a police case against Johnson, and an interrogation by a total of four detectives certainly conveyed the seriousness of the situation.

Holmes reasonably should have known the detectives were interested in her involvement in the crimes.  The detectives asked her about her car before advising her of her *Miranda* rights.  Holmes told detectives she had spoken with [Johnson's cousin], and she knew the detectives were speaking with "everybody."  She thus understood the severity of the situation and the seriousness of the *Miranda* rights the detectives provided her.

Holmes claims detectives used deceptive tactics and false statements to get her to confess.  She faults Detective Cabral for falsely telling her that her car was captured on surveillance video from cameras located behind the Jack-in-the-Box next to the Shell station where the murder occurred.  After hearing this, Holmes admitted she had parked her car next to the Jack-in-the-Box and that Joseph went into the Shell station.

Holmes also faults Detective Cabral for telling her, after contradicting one of her statements with one made by Johnson, that "this is where—where we need to be honest," and later encouraging her to "tell us your side of the story so we know."
. . .
Again, we look to the totality of the circumstances, and we find that the alleged misrepresentation by detectives and their encouragement to Holmes to tell the truth do not establish that her confession was involuntary.

Holmes also claims Detective Biondi became aggressive and sarcastic with her.  Detective Biondi challenged Holmes's assertion that she did not know Johnson had robbed the gas stations until after the robberies occurred, at times calling it "ridiculous" and that she could not "possibly not know."  Holmes, however, continued to assert such was the case and did not back down.  She cannot now argue that Detective Biondi's statements to her somehow rendered her confession involuntary when she did not change her story.

Reviewing the totality of the circumstances, we conclude Holmes impliedly waived her *Miranda* rights when she was interrogated by detectives.  Admitting her statements into evidence was not error.

In *Miranda*, the United States Supreme Court held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination."  384 U.S. at 444.  Under this rubric, an interrogating officer must first advise the potential defendant that he or she has the right to consult with a lawyer, the right to remain silent and that anything stated can be used in evidence against him or her prior to

9

engaging in a custodial interrogation. *Id.* at 473-74. Once *Miranda* warnings have been given, if a suspect makes a clear and unambiguous statement invoking his constitutional rights, "all questioning must cease." *Smith v. Illinois*, 469 U.S. 91, 98 (1984).

A defendant may waive his *Miranda* rights so long as the waiver is "voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception," and "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran v. Burbine*, 475 U.S. 412, 421 (1986). However, an express waiver of *Miranda* rights is not necessary. *Berghuis v. Thompkins*, 560 U.S. 370, 383 (2010); *North Carolina v. Butler*, 441 U.S. 369, 375-76 (1979). The Supreme Court has explained:

> Interrogation provides the suspect with additional information that can put his or her decision to waive, or not to invoke, into perspective. As questioning commences and then continues, the suspect has the opportunity to consider the choices he or she faces and to make a more informed decision, either to insist on silence or to cooperate. When the suspect knows that *Miranda* rights can be invoked at any time, he or she has the opportunity to reassess his or her immediate and long-term interests. Cooperation with the police may result in more favorable treatment for the suspect; the apprehension of accomplices; the prevention of continuing injury and fear; beginning steps towards relief or solace for the victims; and the beginning of the suspect's own return to the law and the social order it seeks to protect.
> . . .
> In making its ruling on the admissibility of a statement made during custodial questioning, the trial court, of course, considers whether there is evidence to support the conclusion that, from the whole course of questioning, an express or implied waiver has been established. Thus, after giving a *Miranda* warning, police may interrogate a suspect who has neither invoked nor waived his or her *Miranda* rights.

*Berghuis*, 560 U.S. at 383; *see also Davis v. United States*, 512 U.S. 452, 458 ("If the suspect effectively waives his right to counsel after receiving the *Miranda* warnings, law enforcement officers are free to question him."); *Butler*, 441 U.S. at 373 (waiver of *Miranda* rights can be inferred "from the actions and words of the person interrogated").

10

In this case, the state court of appeal properly considered the totality of the circumstances in determining whether Holmes invoked her right to remain silent during questioning. It determined that, after being informed of her *Miranda* rights, Holmes willingly answered the officers' questions. It further considered the totality of circumstances when it rejected Holmes's arguments that the officers used deceit, misrepresentation, and aggression to elicit her responses. This Court, considering the totality of the circumstances on habeas review, does note that the officers' use of the term "technicality," as well as their failure to ask her to sign a waiver card or expressly ask her if she was willing to answer questions given her young age points against waiver. However, in light of *Berghuis*, 560 U.S. at 383, this Court cannot find that the state court's determination that Holmes's statements were not involuntary within the meaning of the Due Process Clause contravenes or unreasonably applies federal law, particularly given how uncertain settled law is in the area of waiver, *see Salinas v. Texas*, 133 S. Ct. 2174, 2179-83 (2013); *United States v. Plugh*, 648 F.3d 118, 127 (2d Cir. 2011). Holmes is therefore not entitled to habeas relief on this claim.

<u>Claim Two: Cruel and/or Unusual Punishment</u>

Holmes next contends that her LWOP sentence violates the Eighth Amendment's prohibition against cruel and/or unusual sentences because "[a]t the time [Holmes] was involved in the crimes for which she was convicted, she was an adolescent, and by all accounts a naive adolescent of just a little over 18 years of age." Noting that the Supreme Court has held that LWOP sentences for non-homicide offenses by juveniles are unconstitutional, Holmes argues that "there is no logical, sociological or scientific difference between an adolescent of [Holmes's] ilk, and one who is chronologically a few months younger." *Id.*

11

The Court of Appeal also rejected this claim on direct appeal after applying a "three-pronged approach" under California state law to determine whether Holmes's sentence is grossly disproportionate to the crime committed.

The Eighth Amendment, applicable to the States through the Fourteenth Amendment, proscribes the infliction of "cruel and unusual punishments." U.S. CONST. amend. VIII; *Kennedy v. Louisiana*, 554 U.S. 407, 419 (2008). In determining whether to infer gross disproportionality, a federal court should examine whether a petitioner's sentence is justified by the gravity of his triggering offense and his criminal history, a process similar to the three-pronged approach employed by California state courts. *See Ramirez v. Castro*, 365 F.3d 755, 768 (9th Cir. 2004). Where the crime is murder, even a life sentence without parole is not grossly disproportionate. *See Harris v. Wright*, 93 F.3d 581, 584-85 (9th Cir. 1996) (life imprisonment without possibility of parole for aggravated first-degree murder raises no inference of gross disproportionality); *United States v. LaFleur*, 971 F.2d 200, 211 (9th Cir. 1991) ("Under *Harmelin* [*v. Michigan*, 501 U.S. 957 (1991)], it is clear that a mandatory life sentence for murder does not constitute cruel and unusual punishment."). Furthermore, while the contours of the "gross disproportionality principle" have been called "unclear," the principle is applicable only in the "exceedingly rare" and "extreme" case. *Lockyer v. Andrade*, 538 U.S. 63, 72-73 (2003); *see also Rummel v. Estelle*, 445 U.S. 263, 272 (1980) ("Outside the context of capital punishment, successful challenges to the proportionality of particular sentences have been exceedingly rare.").

Within the last several years the Supreme Court has considered a number of Eighth Amendment cases involving juvenile offenders, that is, defendants who were under the age of 18

12

at the time they committed their offenses. In particular, in *Miller v. Alabama*, ___ U.S. ___, 132 S. Ct. 2455 (2012), a case involving a juvenile who was 14 years old at the time he committed a murder, the Supreme Court held that a mandatory sentence of life without the possibility of parole violates the Eighth Amendment where a sentencing court has no discretion to consider the defendant's youth or other "mitigating qualities." 132 S. Ct. at 2467.

The Supreme Court's recent jurisprudence regarding juveniles does not, however, benefit Holmes. Although Holmes argues that she was only a few months removed from juvenile age when the offense occurred, the fact remains that she was legally an adult when she engaged in a felony that resulted in murder. The state appellate court's decision therefore does not run afoul of *Miller*. Nor can Holmes demonstrate that this is one of the exceedingly rare cases in which the sentence imposed raises an inference of gross disproportionality when compared to the crime and relevant criminal history. As the Court of Appeal explained:

> In light of the nature and scope of Holmes's culpability, her sentence does not shock the conscience or offend fundamental notions of human dignity. Nor is it grossly disproportionate to the crime. None of the mitigating facts overcomes Holmes's intentional and voluntary participation with Johnson in facilitating his robberies, restocking his ammunition supply, and receiving stolen money from him. With full knowledge of Johnson's pattern for robbing gas stations and, in one robbery prior to the murder, his firing of a gun to attempt to get money, she nonetheless remained loyal and helpful to Johnson when he restocked his ammunition supply and when he asked her to stop and wait at the Shell station and park in a lot next door. Her undeviating, knowing, and willing complicity in the crime spree, including the final robbery attempt and murder, far outweighs any personal mitigating factors.

In short, the Court of Appeal's finding that the trial court's sentence of LWOP was not grossly disproportionate to the crime for which Holmes was convicted in light of the circumstances of the instant offense was not contrary to, or an objectively unreasonable application of, any clearly established federal law and was not based upon an unreasonable

13

determination of the facts in light of the evidence presented. Accordingly, Holmes is not entitled to habeas relief on her Eighth Amendment claim.

        <u>Claim Three: Ineffective Assistance of Counsel</u>

        Finally, Holmes argues that her trial counsel rendered ineffective assistance in two ways. First, Holmes faults trial counsel for advising her to reject a plea offer that included the possibility of parole.

        To demonstrate ineffective assistance of counsel under *Strickland v. Washington*, a defendant must show both that his counsel's performance was deficient and that the deficient performance prejudiced his defense. 466 U.S. 668, 687 (1984). A deficient performance is one in which "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment." *Id.* The Supreme Court has explained that, if there is a reasonable probability that the outcome might have been different as a result of a legal error, the defendant has established prejudice and is entitled to relief. *Lafler v. Cooper*, 132 S. Ct. 1376, 1385-86 (2012); *Glover v. United States*, 531 U.S. 198, 203-04 (2001); *Williams*, 529 U.S. at 393-95. Thus, Holmes must show that defense counsel's representation was not within the range of competence demanded of attorneys in criminal cases, and that there is a reasonable probability that, but for counsel's ineffectiveness, the result would have been different. *See Hill v. Lockhart,* 474 U.S. 52, 57 (1985).

        An ineffective assistance of counsel claim should be denied if the petitioner fails to make a sufficient showing under either of the *Strickland* prongs. *See Strickland*, 466 U.S. at 697 (courts may consider either prong of the test first and need not address both prongs if the defendant fails on one).

In reviewing ineffective assistance of counsel claims in a federal habeas proceeding:

> The question "is not whether a federal court believes the state court's determination" under the *Strickland* standard "was incorrect but whether that determination was unreasonable—a substantially higher threshold." And, because the *Strickland* standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard.

*Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (citations omitted); *see also Runningeagle v. Ryan*, 686 F.3d 758, 775 (9th Cir. 2012).

It is through this highly deferential lens that a federal habeas court reviews *Strickland* claims under the § 2254(d) standard. *See Knowles*, 556 U.S. at 123 (citing *Yarborough v. Gentry*, 540 U.S. 1, 5-6 (2003)).

The Sixth Amendment right to counsel extends to the plea bargaining process. *Lafler*, 132 S.Ct. at 1384. Criminal defendants are entitled to the effective assistance of competent counsel during plea negotiations. *Id*. "If a plea bargain has been offered, a defendant has the right to effective assistance of counsel in considering whether to accept it." *Id.* at 1387. In order to show prejudice, "a defendant must show the outcome of the plea process would have been different with competent advice." *Id.* at 1384. When a defendant contends that counsel's defective advice caused him to reject a plea offer and proceed to trial, he has shown prejudice where "but for the ineffective advice of counsel there is a reasonable probability that the plea offer would have been presented to the court (*i.e.*, that the defendant would have accepted the plea and the prosecution would not have withdrawn it in light of intervening circumstances), that the court would have accepted its terms, and that the conviction or sentence, or both, under the offer's terms would have been less severe than under the judgment and sentence that in fact were imposed." *Id.* at 1385. Counsel cannot be required to predict accurately what the jury or court

15

might find if the case goes to trial, but he must give the defendant "the tools needed to make an intelligent decision." *Turner v. Calderon*, 281 F.3d 851, 881 (9th Cir. 2002).

There is no question here that the relevant terms of the plea offer were conveyed to Holmes, as they were discussed in open court in Holmes's presence. The record further shows that Holmes was informed in open court about the potential sentence she faced if she rejected the plea, that Holmes had discussed the plea with her attorney, understood the offer, and rejected it:

> [PROSECUTOR]:   . . . Yesterday I did tell [defense counsel] that before we litigated any motions I would allow [Holmes], if she chose to, to plead guilty to Count One for second-degree murder, admit an arming, and she could plead guilty to three of the robberies, and she would receive a total of 16 years to life. The robberies would be [concurrent].
> And I indicated to him that although I made that offer before and it was not accepted, that it would be withdrawn once we litigated motions. I know we have litigated a couple of motions already and the Court really hasn't done much with respect to [Holmes], but I wanted to put that on the record.
> I also want to put on the record with respect to [Holmes], I, with the permission of [defense counsel] at the preliminary hearing, spoke with [Holmes's] grandmother and mother and told them about just from a human point of view she runs the risk of being convicted of life without parole.
> The best we can do–we discussed in our office about a determinant [sic] sentence and we're not going to offer it, and the best she could do is our offer of 16 to life and she could be out and still be a young woman if she behaved herself in prison, and it's my understanding that's being rejected, but I wanted that to be clear I made that offer.

Defense counsel then affirmatively answered when asked by the court if he had "an adequate opportunity to fully discuss this offer with your client?" The court then asked Holmes if she had "an adequate opportunity to discuss this with your lawyer," and Holmes responded, "Yes, sir." Holmes also affirmatively answered when the court additionally asked, "I just want

16

to be sure you understand the offer and you don't have any questions about it. Is that the situation, ma'am?"

In these circumstances, Holmes has failed to demonstrate that trial counsel's alleged advice to reject the offer fell below an objective standard of reasonableness. As the state superior court determined in denying this claim on habeas review:

> [Holmes] had acted as the getaway driver for each robbery, and it would not have been unreasonable for counsel to have advised her to take her chance at trial, as even an 18-years-to-life sentence,[3] as was offered in the bargain described by the prosecutor at the outset of the preliminary hearing, could run [Holmes] the risk of never being granted parole and serving the rest of her life in prison, while it might be possible that a jury would believe that at the time of each robbery, [Holmes] did not realize that [Johnson] was about to commit a robbery, let alone one with use of a gun, and thus did not have the specific intent to rob, even though it was not likely that a jury would have so believed. As [Holmes] and her counsel might reasonably have still believed that there was some kind of chance she could win at trial as opposed to the chance that even with an 18-years-to-life sentence she might never get out of prison, it is not necessarily believable that [Holmes] would have accepted the plea bargain had she understood the mandatory life-without-parole sentence that she faced, if in fact she was unaware of that, which itself is not believable, and if she had made such an allegation in the habeas petition, which she does not do.

Although it may be a close question because of her age, this Court must conclude that the state court's rejection of this ineffective assistance claim was both reasonable and not contrary to federal law.

Holmes additionally argues that trial counsel was ineffective for advising her not to testify. A tactical decision exercised by counsel deserves deference when counsel makes an informed decision based on strategic trial considerations and the decision appears reasonable under the circumstances. *See Sanders v. Ratelle*, 21 F.3d 1446, 1456 (9th Cir. 1994). On the other hand, "it cannot be permissible trial strategy, regardless of the merits or otherwise, for

---

[3] The record indicates that Holmes was offered a plea of 16 years to life.

counsel to override the ultimate decision of a defendant to testify contrary to his advice," *United States v. Mullins*, 315 F.3d 449, 453 (9th Cir. 2002), because "a defendant in a criminal case has the right to take the witness stand and testify in his or her own defense," *Rock v. Arkansas*, 483 U.S. 44, 49 (1987).  A defendant may, however, waive this right, either explicitly or implicitly.  *See United States v. Pino-Noriega*, 189 F.3d 1089, 1094 (9th Cir. 1999).  Such a waiver may be inferred from a defendant's failure to testify at trial or to notify the trial court of his desire to testify.  *See id.* at 1094-1095.  "Although the ultimate decision whether to testify rests with the defendant, he is presumed to assent to his attorney's tactical decision not to have him testify," unless he "reject[s] his attorney's tactical decision by insisting on testifying, speaking to the court, or discharging his lawyer."  *United States v. Joelson*, 7 F.3d 174, 177 (9th Cir. 1993).

Here, Holmes has failed to demonstrate that counsel rendered prejudicially ineffective assistance by advising her to waive her right to testify on her own behalf.  The record does not indicate that Holmes ever expressed to the trial court that she intended or desired to testify over counsel's objections or advice.  While Holmes may now wish, with the benefit of hindsight, that she had testified at trial, the record reflects that Holmes voluntarily waived that right.  Holmes is therefore not entitled to federal habeas corpus relief on either of her ineffective assistance of counsel claims.

## V. CONCLUSION AND ORDER

Holmes is not entitled to relief on any ground raised in her Petition.

**IT IS THEREFORE ORDERED THAT** the Petition under 28 U.S.C. § 2254 for Writ of Habeas Corpus is **DENIED**.

**IT IS FURTHER ORDERED THAT** the Court grants a Certificate of Appealability solely to her claims that statements she made to law enforcement should have been suppressed because she did not validly waive her right to remain silent and that her trial counsel was ineffective for advising her to decline a plea offer. *See* 28 U.S.C. § 2253(c); *Banks v. Dretke*, 540 U.S. 668, 705 (2004) ("To obtain a certificate of appealability, a prisoner must 'demonstrat[e] that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.'" (quoting *Miller-El*, 537 U.S. at 327)). Any further request for a Certificate of Appealability must be addressed to the Ninth Circuit Court of Appeals. *See* FED. R. APP. P. 22(b); 9TH CIR. R. 22-1.

The Clerk of the Court is to enter judgment accordingly.

Dated: March 6, 2014.

/s/James K. Singleton, Jr.
JAMES K. SINGLETON, JR.
Senior United States District Judge