1
2
3
4
5
6
7
8                        UNITED STATES DISTRICT COURT

9                    FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   JESSICA HOLMES,                          No. 2:11-cv-2710 JKS KJN P

12                 Petitioner,

13        v.

14   DEBORAH K. JOHNSON, Warden,              FINDINGS AND RECOMMENDATIONS

15                 Respondent.

16

17        Petitioner is proceeding through counsel with a petition for a writ of habeas corpus

18   pursuant to 28 U.S.C. § 2254.  By order dated December 5, 2013, this matter was reassigned to

19   Senior District Judge James K. Singleton for all further proceedings.  On March 7, 2014, Judge

20   Singleton issued an order denying petitioner's habeas petition in its entirety and judgment was

21   entered accordingly.  Petitioner filed a timely appeal, claiming that her statements to police were

22   obtained in violation of Miranda v. Arizona, 384 U.S. 436, 476 (1966), and that she was entitled

23   to an evidentiary hearing on her claim that she received ineffective assistance of counsel in the

24   course of plea negotiations.

25        On July 17, 2015, the United States Court of Appeals for the Ninth Circuit affirmed the

26   judgment with respect to petitioner's Miranda claim, but reversed and remanded to the district

27   court to conduct an evidentiary hearing on one aspect of petitioner's claim that she received

28   ineffective assistance of counsel in the course of plea negotiations.  By order dated July 27, 2015,

1

1   this matter was referred to the undersigned for the limited purpose of holding that evidentiary

2   hearing and thereafter issuing findings and recommendations with respect to the "remanded

3   issue." (ECF No. 47.)  The evidentiary hearing took place on August 22-23, 2016.  For the

4   following reasons, it is recommended that petitioner's claim on remand that her trial counsel

5   rendered ineffective assistance in the course of plea negotiations be denied.

6   **I. Background**

7       **A. Factual Background**

8           During a two-week period in 2005, Holmes and her boyfriend,
9   Corey Schroeder, along with Joseph Johnson, robbed or attempted
to rob at least five gas stations in the Sacramento area.  Schroeder
would case the station, Johnson would rob the station attendant at
10   gunpoint, and Holmes would drive them away.  During the group's
final attempted robbery, Johnson shot and killed the station
11   attendant, Prem Chetty.

12           Holmes and Johnson were tried in a unitary trial with separate
13   juries; Schroeder's trial was severed from Holmes's and Johnson's
trial.  Prior to trial, Holmes moved to exclude statements she made
14   to law enforcement during interrogation on the grounds that she did
not knowingly and voluntarily waive her Miranda[1] rights and the
15   admission of her statements at trial would violate California
Evidence Code § 352.  The trial court held a hearing on the motion
16   where Holmes's counsel stated, "[W]e're not contending that the
Miranda advisements weren't given or weren't given properly.  I
17   think once you look at the transcript, once you watch the video, I
think it's clear that they did read the Miranda advisements directly
18   from the card and I think they are adequate."  Counsel instead
claimed that Holmes did not waive her Miranda rights because she
19   gave no express waiver, the "tone of the interrogation" had become
coercive during the interrogation, Holmes had been under the
20   influence of methamphetamine, and she could hear Schroeder in an
adjacent interview room.  The trial court ultimately concluded that
21   the detectives' interrogation of Holmes "was noncoercive and it
was compliant in every respect with the terms and provisions of
22   Miranda . . . ."  The prosecution then played a redacted videotape of
Holmes's interview to her jury during the prosecution's case-in-
chief.
23
24           At the conclusion of trial, the jury found Holmes guilty of murder
occurring during the commission of an attempted robbery, two
25   counts of attempted robbery, and three counts of robbery.  The jury
also found true gun-use enhancements and principal-armed
26   enhancements as to each count.  The trial court sentenced Holmes
to state prison for life without possibility of parole ("LWOP") for
27   the special-circumstance murder plus a determinate term of eight

28   ---
[1]  See Miranda v. Arizona, 384 U.S. 436 (1966).

years and eight months for the remaining convictions and enhancements.

Following sentencing, Holmes moved for the court to reconsider its sentence on the ground that her LWOP sentence violated the state and federal constitutional provisions against cruel and/or unusual punishment. After hearing arguments from both parties, the court denied Holmes's motion.

(ECF No. 40 at 1-3.)

**B. Procedural Background**

After her judgment of conviction was affirmed on appeal, petitioner filed a petition for writ of habeas corpus in the California Superior Court. Therein, she claimed that she received ineffective assistance of counsel during plea negotiations. She explained:

Trial attorney advised the defendant to turn down the plea offer of 15-life, stating that defendant might as well turn down the offer and take it to trial because the defendant would get the same sentence if lost. Defendants rights to effective assistance includes the period of the plea process as well as during trial. If attorney had correctly informed the defendant that in a "special circumstance" case requiring felony murder, the mandatory sentence of Life Without the Possibility of Parole, the defendant would have been able to properly decide on either to take plea or to been better able to make decisions reguarding [sic] trial. The defendant was 19 years old when the trial had started and didn't know anything but what counsel would advise her. Defendant had even considered taking the people's plea offer at one point but because counsel had informed the defendant the [sic] she might as well fight it because a life sentence is a life sentence defendant decided to take her case to trial. Even when defendant lost trial, she didn't know that in a special circumstance, she had to automatically get life without parole until the day of sentencing.

(Resp't's Lod. Doc. 7 at 17-18.)

In denying relief, the Superior Court found that petitioner failed to state a prima facie case because she did not claim that she would have accepted the plea offer if she had been correctly informed by trial counsel that she would receive a mandatory sentence of life without parole if she lost at trial. (Resp't's Lod. Doc. 8 at 4.) The Superior Court also determined that it was not necessarily unreasonable for her trial counsel to advise her to "take her chances at trial" because "petitioner and her counsel might reasonably have still believed that there was some kind of chance she could win at trial, as opposed to the chance that even with an 18-years-to-life sentence

3

1   she might never get out of prison."  Finally, the Superior Court found that petitioner's statements

2   in open court reflected that she understood the penalty she faced if she were convicted of the

3   charges against her.  (Id.)

4          Petitioner raised this same ineffective assistance of counsel claim again in petitions for a

5   writ of habeas corpus filed in the California Court of Appeal and California Supreme Court.

6   (Resp't's Lod. Docs. 9, 11.)  Those petitions were summarily denied.  (Resp't's Lod. Docs. 10,

7   12.)

8          On October 13, 2011, petitioner filed a habeas petition in this court.  Among other claims,

9   petitioner argued that her trial counsel rendered ineffective assistance in connection with his

10  advice to her regarding whether she should accept the government's plea offer of 16 years to life

11  in prison.  As explained above, that claim was originally denied by the district court.  However,

12  on appeal the Ninth Circuit remanded the matter for an evidentiary hearing.  The court explained:

> Petitioner's initial habeas petition alleged that her trial counsel
> advised her that the sentence imposed under the plea – sixteen years
> to life in prison with the possibility of parole – was functionally the
> same as the sentence imposed if she were convicted – mandatory
> life in prison with no possibility of parole.  Unquestionably, this
> advice, if given, was incorrect.   The life sentence following
> conviction was not only mandatory but was also imposed without
> the possibility of parole.[2]
>
> Respondent counters that, regardless of the advice Petitioner may
> have received from counsel, the record shows that she was aware of
> the risks associated with going to trial versus taking the plea deal.
> Respondent points to statements made by the prosecutor in
> Petitioner's presence regarding the danger of going to trial and
> being "convicted of life without parole."  Petitioner counters that
> the prosecutor's comments could not have cured the effect of the
> improper advice because they do not convey the mandatory nature
> of the sentence.   Respondent also cites Petitioner's comments,
> which indicated that she had spoken with trial counsel regarding the
> plea and thought she understood the offer.  Petitioner counters that
> her statements do not reveal the content of that advice and,
> therefore, do not show that she properly understood the plea offer.
> We agree with Petitioner.  The record before the state court did not
> conclusively show that Petitioner understood the advantages of the

_____

[2]   Petitioner also alleges that counsel's strategy during trial amounted to ineffective assistance of
counsel because counsel had a flawed understanding of the case.  However, this claim, discussed
for the first time in her Traverse, is entirely new and unexhausted.  See Cacoperdo v.
Demosthenes, 37 F.3d 504, 507 (9th Cir. 1994) ("a ground for relief is not properly raised in a
Traverse").

4

plea.

Petitioner also contends that she demonstrated prejudice.  Where a plea offer is rejected based on erroneous advice, the petitioner must show prejudice in the following way: (1) a "reasonable probability" that she would have accepted the plea offer; (2) that the plea would have been entered without the prosecutor canceling it or the trial court refusing to accept it; and (3) that the offer was more favorable than the sentence actually imposed.  See Frye, 132 S. Ct. at 1409; Lafler, 132 S. Ct. at 1385-86.  In her initial state petition, Petitioner stated that she had originally planned to accept the plea but "decided to take her case to trial" because of trial counsel's advice. Respondent contends that Petitioner's statement is insufficient because she does not specifically allege that she would have taken the plea offer "but for" the improper advice.  We disagree. Petitioner, who was pro se at the time she filed the petition, demonstrated a colorable claim for relief.

Accordingly, we remand to the district court so that it may conduct an evidentiary hearing regarding the ineffective assistance of counsel claim Petitioner raised in her pro se petition in the California Superior Court, i.e. that counsel did not inform her that she faced a mandatory life sentence without the possibility of parole.

(ECF No. 46 at 8-10.)

## II.  Applicable Standards of Review

Title 28 U.S.C. § 2254 confers upon a federal district court the jurisdiction to consider a petition for writ of habeas corpus challenging a state court conviction.  A writ of habeas corpus is available under section 2254 only on the basis of some transgression of federal law binding on the state courts.  See Peltier v. Wright, 15 F.3d 860, 861 (9th Cir. 1994); Middleton v. Cupp, 768 F.2d 1083, 1085 (9th Cir. 1985).  A federal writ is not available for alleged error in the interpretation or application of state law.  See Estelle v. McGuire, 502 U.S. 62, 67-68 (1991); Park v. California, 202 F.3d 1146, 1149 (9th Cir. 2000); Middleton, 768 F.2d at 1085.

Where a state court resolves a federal constitutional claim on the merits, the petitioner in federal court may not succeed on that claim absent a showing that the state court resolution of the claim was contrary to law or unreasonable.  28 U.S.C. § 2254(d).  Congress adopted this standard when it revised the habeas statutes in 1996 as part of the Anti-terrorism and Effective Death Penalty Act (the "AEDPA").  To meet the standards, a petitioner must establish that the state court's adjudication of the claim:

1      (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as
2      determined by the Supreme Court of the United States; or

3      (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the
4      State court proceeding.

5  28 U.S.C. § 2254(d). In 2011, the Supreme Court made clear that, when making the

6  determination that a state court decision was contrary to law or unreasonable, a federal court may

7  not consider evidence which was not before the state court. Cullen v. Pinholster, 563 U.S. 170,

8  180-86, 131 S. Ct. 1388, 1398-401 (2011). Section 2254(d) is a gateway. If a petitioner satisfies

9  either subsection (1) or (2) for a claim, then the federal court considers that claim de novo. See

10  Panetti v. Quarterman, 551 U.S. 930, 953 (2007) (When section 2254(d) is satisfied, "[a] federal

11  court must then resolve the claim without the deference AEDPA otherwise requires."); Frantz v.

12  Hazey, 533 F.3d 724, 737 (9th Cir. 2008).

13      There are two ways a petitioner may satisfy subsection (d)(2). Hibbler v. Benedetti, 693

14  F.3d 1140, 1146 (9th Cir. 2012). She may show the state court's findings of fact "were not

15  supported by substantial evidence in the state court record" or she may "challenge the fact-finding

16  process itself on the ground it was deficient in some material way." Id. (citing Taylor v. Maddox,

17  366 F.3d 992, 999-1001 (9th Cir. 2004)). If a state court makes factual findings without an

18  opportunity for the petitioner to present evidence, the fact-finding process is deficient and the

19  state court opinion is not entitled to deference. Hurles v. Ryan, 752 F.3d 768, 790-91 (9th Cir.),

20  cert. denied, 135 S. Ct. 710 (2014).

21      In this case, the Ninth Circuit concluded that petitioner had overcome the hurdle posed by

22  section 2254(d)(2) by showing that the state court unreasonably failed to develop the factual basis

23  of her claim of ineffective assistance of counsel. The court explained:

24      Under Townsend [v. Sain, 372 U.S. 293, 313 (1963)], a federal district court must grant an evidentiary hearing in the present
25      situation: The state court resolved the merits of material factual disputes without affording Petitioner a full and fair hearing or
26      otherwise developing the factual record. See Townsend, 372 U.S. at 313; see also Hurles, 752 F.3d at 791.

27

28  (ECF No. 46 at 7-8.) Because petitioner has demonstrated that the decision of the state court on

1   her claim of ineffective assistance of counsel was based on an unreasonable determination of the

2   facts, this court will address that claim de novo.  Frantz, 533 F.3d at 737.

3   **III.  Petitioner's Ineffective Assistance of Counsel Claim**

4          Petitioner claims that her trial counsel rendered ineffective assistance in advising her to

5   reject the government's plea offer that would have resulted in a sentence of 16 years to life.[3]

6   (ECF No. 2 at 11.)  In those portions of her claim that are pertinent to the issue before this court

7   on remand, petitioner alleges that counsel told her "if she were to be convicted, the sentence she

8   would receive would be identical to the sentence that had been offered."  (Id. at 11-12.)

9   Petitioner states that she "rejected the offer because her trial counsel advised her to reject it."  (Id.

10  at 11.)  Petitioner states that if she had known she would receive a mandatory sentence of life in

11  prison without the possibility of parole if she were convicted after a trial, she would have

12  accepted the plea offer.  (Id. at 49.)[4]

13         **A.  Testimony Introduced at Evidentiary Hearing**

14         The following testimony was introduced at the evidentiary hearing conducted pursuant to

15  the Ninth Circuit remand order.  That testimony has been considered by this court only insofar as

16  it is relevant to the claim on remand.  To the extent testimony was offered to support any other

17  aspect of petitioner's claim of ineffective assistance of counsel, it has not been considered for that

18  purpose.

19         **1.  Trial Counsel Jesse Ortiz**

20         Petitioner's trial counsel Jesse Ortiz (hereinafter Ortiz) testified that he told petitioner

21  "many times," although in different terms, that "the sentence was mandatory life in prison

22  without possibility of parole" if she went to trial and was convicted of special circumstance

23  felony murder.  (ECF No. 98 at 25-26.)  He also told petitioner that "she had a defense."  (Id. at

24  26.)  More specifically, Ortiz told petitioner that her defense would be that the prosecution

25  _____

[3]  Previously the offer was 18 years to life.  (ECF No. 98 at 159-60.)

26
[4]   Petitioner also claims that her trial counsel rendered ineffective assistance in telling her that

27  she would prevail at trial and would not be convicted of felony murder, when he should have
    known that counsel's planned defense would fail.  (Id. at 43-48.)  However, that portion of

28  petitioner's claim is not before this court on remand.  (ECF No. 46.)

couldn't prove its case beyond a reasonable doubt.  (Id. at 71.)  He did not tell expressly petitioner

that "she was going to be convicted," although he believed the prosecution had a "strong case."

(Id. at 26.)

Ortiz further testified:

> I don't remember the specific words that I used with her, but I do remember she asked me the various possibilities.  And one of them would have been she would be acquitted so that would mean she would be found not guilty and walk.
>
> She had been made an offer by the People.  So that would be a possibility, that she accept the offer that was being conveyed at that point.
>
> And the other one would be, we can go to trial but if we lose, she would get life without parole.

(Id. at 34.)  Ortiz clarified that he "didn't say the word mandatory."  (Id.)  However, he

"essentially" told petitioner she would "absolutely be sentenced to life in prison without

possibility of parole," and that "she would get life without parole."  (Id. at 35.)

Ortiz did not "remember specifically" what he told petitioner about his "opinions on the

[plea] deal."  (Id. at 37.)  However, he explained that he never "forced" his clients to accept or not

accept plea offers.  (Id.)  He did not "remember specifically telling her whether I thought she

should or shouldn't take the deal."  (Id. at 38.)

Petitioner's counsel asked Ortiz about a declaration he signed in connection with these

proceedings, which contained the following language:

> I told her that if she went to trial and lost, she would be sentenced to life without the possibility of parole; 18 years to life was a long time.  She asked me, What does life mean?  I responded that, life is life in prison, but the parole board would decide whether to release/parole her after she completes the initial 18 years.

(Id. at 44.)  Petitioner's counsel pointed out that in this declaration, which contained Ortiz's

recollection of what he told petitioner about her sentence, Ortiz did not use the word "mandatory"

to describe the sentence of life without parole that she would receive if she was convicted after a

trial.  (Id. at 45.)  Ortiz agreed, but testified that he told petitioner "if she lost that she would be

sentenced to life without the possibility of parole because that was the only option available to the

court."  (Id.)  Ortiz conceded he did not include the language "that was the only option available

1   to the court" in his declaration.  (Id. at 45-46.)  He later explained:

2
> I'm not saying I told her at that specific time those words.  But over
> the course of my representation of her, we talked about what a
3   > special circumstance was and what it meant.

4   > And what I told her was what I understood the law to be, was that
> when a special circumstance is alleged, there are two potential
5   > punishments.  One is death, which they were not seeking, and the
> other one is – the only other option would be life without the
6   > possibility of parole.

7   (Id. at 46.)  At another point, Ortiz testified, "I don't remember if – I don't think I used the word

8   "mandatory."  I just said that if she's convicted, she would get life without the possibility of

9   parole."  (Id. at 49.)

10          With regard to what he told petitioner about the strength of the defense case, Ortiz

11  testified he told petitioner that if the jury did not believe her statements to the police interrogator

12  that she did not know her co-defendants intended to commit robberies, "then they would find her

13  guilty."  (Id. at 83.)  Ortiz also told petitioner that the fact there were no eyewitnesses who saw

14  her in the getaway car "was a fact in our favor," but that she had neutralized that favorable fact by

15  telling police that she drove the car.  (Id.)  Ortiz had discussions with petitioner about the

16  importance of her police interview.  (Id. at 84.)  He explained that "the defense that we were

17  going to argue was that she did not know that these robberies were going to take place."  (Id.)

18  When asked what he told petitioner about her chances of prevailing after a trial, Mr. Ortiz

19  testified:

20
> I don't think I told her she was going to lose.  I told her that it was
> difficult for us, her interview, and it was going to come down to
21  > whether or not the jury believed her – in her, you know, statements
> throughout the interview, that she didn't know they were going to
22  > happen before.

23  (Id.)

24          Ortiz talked to petitioner about the difficulties inherent in the fact that she and her co-

25  defendants participated in "so many" robberies and that the prosecution had a surveillance tape of

26  petitioner and her two co-defendants in a Big Five store buying ammunition.  (Id. at 85.)  Ortiz

27  emphasized that there were no eyewitnesses who placed petitioner herself at the scene of the

28  robberies.  (Id.)  However, there was also evidence in the form of her admissions during her

9

1  police interview.  (Id. at 86.)  Ortiz testified that he "never told [petitioner] she was not going to

2  be convicted.  I told her that was our argument, that was our defense, that she didn't know.  But

3  that if a jury didn't believe that she didn't know, then she would be convicted."  (Id.)

4        Ortiz also testified that he originally planned to call an expert witness on intimate partner

5  battering (Dr. Barnard) to "explain why Jessica would continue driving, even with the knowledge

6  that the people she was driving were committing robberies."  (Id. at 87.)  Ortiz told petitioner this

7  would "kind of lend support to the argument that [petitioner] didn't – either she couldn't say no or

8  she didn't know."  (Id. at 88.)  Ortiz did not give petitioner his opinion on whether this defense

9  would "work," but merely "indicated that we can use this kind of opinion from [the expert] to

10  help explain ultimately what our defense was."  (Id. at 88-89.)  However, Ortiz ultimately decided

11  not to call Dr. Barnard as a witness because he believed her testimony would open up for

12  questioning the topic of petitioner's drug use.  (Id. at 89-90, 109.)  Ortiz testified that he

13  "assumed" petitioner believed Dr. Barnard was going to testify at the time she rejected the plea

14  offer.  (Id. at 91-92.)  However, at another point, Ortiz testified that at the time the prosecutor

15  made his final plea offer, he didn't think he told petitioner he was "going to call Dr. Barnard so

16  reject the offer" or that "the issue of Dr. Barnard taking the stand or not was discussed."  (Id. at

17  125-26.)

18        Ortiz did not decide whether he was going to call Dr. Barnard as a witness until he saw

19  "how the evidence played out" at trial.  (Id. at 125.)  He told petitioner that Barnard was "a

20  witness in our case," but "whether she was ultimately called, that decision would be made later in

21  the trial."  (Id. at 127.)  Ortiz ultimately decided not to call any witnesses.  (Id. at 130.)

22        When he was asked whether he thought petitioner should accept the prosecution's plea

23  offer, Ortiz testified,

24        I'm not sure what I thought at the time.  I know we talked about
        how hard of a case it was.  We talked about how hard of a decision
25        it was regarding the offer.  And we talked about the specific
        scenarios of how things could play out.
26

27        Like I said before, . . . I don't have a specific recollection that I ever
        sat down with her and said: You need to take this deal.

28        I explained the deals and different scenarios as to what could

1    happen, but I don't remember ever saying: Jessica, you've got to do
     this.  You've got to take this deal.

2

3    (Id. at 137-38.)  He stated that he talked to petitioner "about the offers and what they meant and

4    whether or not there was – that we had a chance."  (Id. at 138.)  Ortiz did not tell petitioner she

5    ought to accept the prosecution's plea offer for 16 years to life.  (Id. at 103.)  He "just explained

6    to her what could happen, given what we had, and let her know what her family had thought."

7    (Id. at 105.)

8         Ortiz further testified that he told petitioner the benefit of accepting a plea offer is that "it

9    avoids the risk of trial."  (Id. at 153.)  He and petitioner talked about the fact that if she accepted

10   the plea offer, she would be eligible for parole after serving the initial 16 years in prison and that

11   at that point "the parole board would essentially decide whether or not to release her."  (Id. at

12   154.)  When asked about petitioner's allegation that he told her "a life sentence is a life sentence,"

13   Ortiz explained that when petitioner asked him what the word "life" meant in the context of the

14   offer for 16 years to "life," he explained that "life is life in prison."  (Id.)

15        On cross-examination, Ortiz testified that he explained to petitioner what her sentence

16   would be if she were convicted of special circumstance murder, as follows:

17        The way I explained it was that special circumstance – she asked
          what that was.  I explained to her what it was and said that the
18        punishment for a special circumstance, if found true, there are two
          punishments.  One is the death penalty, and the other is life without
19        possibility of parole.  And those were the only two options.

20   (Id. at 158.)  He never told petitioner there was "any other kind of alternative besides death or life

21   without parole if convicted."  (Id. at 159.)  Ortiz also explained what he told petitioner about the

22   prosecution's two plea offers of 18 years to life and 16 years to life:

23        We explained first what the offer was.  And she asked – because it
          was – 18 to life was the first offer.  And she asked what the "to life"
24        means.  And I indicated to her that it – that means life in prison.
          You know, life means life.
25
          And we discussed how that worked.  Basically that they would do
26        the initial period, 18 years or 16, and at that point it would be up to
          the parole board to decide whether or not to release her.
27

28   (Id. at 159-60.)  Ortiz agreed that the essence of his statements to petitioner in this regard was that

1    "life means you could be in prison for life unless the parole board lets you out." (Id. at 161.)

2        Ortiz also testified he contrasted the sentence she would receive under the plea offer to the

3    sentence she would receive if she were convicted of special circumstance murder, as follows:

4            I basically just said – or what I said was that if she – if the special
             circumstance is found true, she's convicted of that special
5            circumstance, that she would receive life in prison without
             possibility of parole.
6

7    (Id. at 160.)  He "made it clear" to petitioner that if she accepted the plea offer, there "was the

8    possibility of parole," but if she was convicted "there was no possibility of parole." (Id.)  He also

9    testified that he told petitioner "if she lost at trial, she would get life without parole." (Id. at 178.)

10       Ortiz testified that petitioner did not want to accept the plea and that petitioner's mother

11   and grandmother did not want her to accept the plea either.  (Id. at 163.)  He agreed that petitioner

12   "look[ed] to her grandmother and mother for advice," specifically about the plea offers.  (Id.)

13   Ortiz stated that he was present when the prosecutor explained the plea offer to petitioner's

14   mother and grandmother, and that they were "against it." (Id. at 165.)  He then communicated

15   their opinion to petitioner, who also personally rejected the offer.  (Id. at 165-66.)

16       Ortiz testified that he went over the probation report with petitioner prior to the sentencing

17   proceedings, including the recommended sentence of life without parole.  Ortiz stated that

18   petitioner did not "say or do anything that would indicate she was surprised by [her] sentence."

19   (Id. at 169.)  Ortiz later filed a motion to recall petitioner's sentence.  (Id.)  Petitioner did not tell

20   him before he filed that motion that she didn't know that "life without parole was the mandatory

21   sentence if she was convicted," nor did petitioner's mother or grandmother tell him this alleged

22   fact.  (Id.)  Ortiz kept in touch with petitioner after the trial and she never indicated to him that

23   she did not understand the sentence she received.  (Id. at 170.)  Nor did petitioner's grandmother

24   ever tell Ortiz that she did not know until the sentencing proceedings that petitioner would receive

25   a sentence of life without parole if she were convicted.  (Id.)   Ortiz did not recall explaining

26   petitioner's sentence "in any manner that it was – that the court had any sort of discretion if she

27   were convicted of the charges." (Id.)

28   ////

1    Ortiz testified he believed petitioner had "a viable defense." (Id. at 171.) He explained

2    that, with respect to which witnesses he intended to call at trial, "the way the trial laid out

3    definitely helped the decision to call witnesses, including Jessica." (Id.) He was "pretty sure" he

4    told petitioner she would get "life without the possibility of parole," and not "life without

5    parole," because "that's what the phrasing is." (Id. at 178.) When he was asked whether, in his

6    discussions with petitioner, he explained the difference between the word "life" in the plea offer

7    for sixteen years to "life," and her sentence of "life without parole" if she was convicted after a

8    trial, Ortiz responded:

9
         What I said to her was . . . when we talked about the life – the 18
10       years to life or 16 years to life offer, it was in discussing the offer
         that was conveyed that this life is life comment came about.

11       When we're discussing the issue about what happens if we go to
12       trial and we lose, that's a separate issue. And that was that if she
         went to trial and lost, she would be sentenced to life without the
13       possibility of parole.

14       So it was the same conversation, but they were two different issues.
         One was what was meant by the 18 to life offer, and that it was a
15       long time, that life is life, but that the parole board would make that
         determination at the expiration of the determinate part of the term.

16       A separate part of the conversation, but the same conversation, we
17       discussed that if she went to trial and lost, that she would get life
         without the possibility of parole.

18       And that was a conversation that – that conversation happened, you
19       know, many times. But in the context of what you're asking me,
         same conversation, but two different.

20    (Id. at 179-80.)

21    On re-cross examination, when asked again for the exact words he used to explain

22    "special circumstance murder" to petitioner, Ortiz responded,

23       The consequences of special circumstance, that there were two
24       possibilities: One was the death penalty, and one was life without
         the possibility of parole. Those were the only two options
25       available.

26    (Id. at 181.) When asked whether he ever told petitioner that if she was convicted "she was never

27    getting out," Ortiz responded, "I'm sure." (Id. at 182.) However, he did not have "a specific

28    recollection of the words that I used." (Id.)

13

1

**2. Petitioner Jessica Holmes**

2          Petitioner testified that shortly after she was arraigned, Mr. Ortiz came to visit her and told

3    her that she was "facing a special circumstance, which was felony murder." (Id. at 207.)  He told

4    her that her sentence "could be the death penalty and life without parole." (Id. at 208.)  He did

5    not tell her that it was "mandatory life without parole" or that "the judge would have no choice

6    but to sentence you to life without possibility of parole."  (Id.)  She testified:

7
> The penalty – he – the first time he told me about life without, he
> had told me that I could be facing life without parole or the death
8    > penalty.  But he said "could."  He didn't say it was mandatory that I
> was going to face those.
9

10   (Id.)  Petitioner testified that Ortiz did not use the exact words, "you will be sentenced to life

11   without possibility of parole."  (Id. at 209.)  She testified that Ortiz told her she shouldn't accept

12   the first plea offer of eighteen years to life because "it's the beginning of the game, and that we

13   shouldn't take the deal."  (Id. at 211.)  She didn't want to accept that offer either, because she

14   "couldn't fathom" spending eighteen years in prison.  (Id.)

15          Approximately two weeks before her trial started, Ortiz told her that a new plea offer had

16   been made.  (Id. at 213.)  He explained that "the deal was 16 to life."  (Id. at 214.)  She told him

17   she thought she would like to accept that offer.  (Id. at 215.)  Ortiz responded that "it's not an

18   offer, just like the 18 years to life, that they don't have any evidence against me, and that I might

19   as well take it to trial because I would get the exact thing if I lost."  (Id.)  She explained,

20
> I knew that life without was on the table.  But when he said that life
> was life, that I would get the same thing if I lost, I figured that – I
21   > didn't know it was mandatory.  I thought I would get anywhere
> between 16 to life to life without if I had lost.  And since he was so
22   > – he was very adamant on us not losing.

23   (Id.)  She also testified that Ortiz:

24
> basically said life is life.  That the deal that they are offering me is
> not – it is not a deal, that I will be getting the same thing if I lost
25   > [at] trial.

26   (Id. at 254.)  Ortiz also told her that "there is no way that a jury can find me guilty based on the

27   evidence that they have."  (Id. at 215.)

28   /////

1       Petitioner testified that she would have pled guilty had she understood that the sentence

2   she would receive if she were convicted after a trial was "mandatory life in prison, that the judge

3   had no choice but to sentence you to prison, mandatory life in prison." (<u>Id.</u> at 227-28.)  She also

4   testified that she would have accepted the plea offer had she understood that Dr. Barnard was not

5   going to testify in her behalf and that the only defense argument would be that the prosecution

6   had failed to demonstrate her guilt beyond a reasonable doubt.  (<u>Id.</u> at 228.)  She stated:

7
8           Jesse – when the deal was offered to me, Jesse told me that I shouldn't take the 16 to life deal because I would have got the same thing if I lost.

9
10          So when he had said that, I figured I could get anywhere between 16 years to life and life without, because life without was the maximum, not the mandatory from my perspective – from my understanding.

11

12  (<u>Id.</u> at 229.)

13      Petitioner also testified that when she told the trial judge she had had enough time to talk

14  to her lawyer about the plea offer and still wished to reject it, she "felt that I had the proper

15  amount of time to talk with my attorney about it based on what he had told me about what would

16  happen in trial." (<u>Id.</u> at 231.)  She testified that Ortiz told her that, based on the evidence the

17  prosecution presented at the preliminary hearing, "no jury can find me guilty." (<u>Id.</u> at 231, 232.)

18  He also told her the defense could spin the evidence against her in her favor.  (<u>Id.</u> at 232.)  Ortiz

19  told petitioner that Dr. Barnard was her "main witness" and that Barnard "was supposed to go up

20  and testify on battered woman syndrome, which explained the fact that I didn't stop the guys from

21  committing these robberies because I had dealt with violence in my past." (<u>Id.</u> at 234.)

22      On cross-examination, when asked whether Ortiz informed her that the special

23  circumstance charge "carried a penalty of either the death penalty or life in prison without

24  possibility of parole," petitioner testified that Ortiz told her she "faced the death penalty and life

25  without possibility of parole." (<u>Id.</u> at 237-38.)  She agreed that other than that statement, he did

26  not mention any other penalties that the special circumstance charge carried.  (<u>Id.</u> at 238.)  Mr.

27  Ortiz told her that she "could be facing life without the possibility of parole" if she lost at trial,

28  and she understood that to mean that, if she received such a sentence, she would never be released

1    from prison.  (<u>Id.</u>)  She understood that if she was convicted after a trial, she "could" get life in

2    prison without the possibility of parole.  (<u>Id.</u>)  She understood that she would "have the possibility

3    of parole" if she accepted the plea deal, but she also thought she would "still get charged with the

4    special circumstance" even with the plea deal.  (<u>Id.</u> at 239.)

5          Petitioner denied that she understood the only penalty she would face if she was convicted

6    would be life in prison without the possibility of parole.  (<u>Id.</u> at 240.)  Rather, her understanding

7    was that she "could get anywhere between nothing to life without parole."  (<u>Id.</u>)  Petitioner was

8    then asked, "if you were convicted at trial, what other sentence did you think you could get?"

9    She responded, "Well, Jesse Ortiz told me when the plea deal was offered that I would get the

10   same thing if I lost, so the 16 to life wasn't even a deal."  (<u>Id.</u>)  She testified that Ortiz told her "I

11   would be getting the same thing if I lost so I might as well take my chances at trial."  (<u>Id.</u>)  She

12   also testified,

13                    He said that when they had offered me the 16 years to life, he said
                     that it is not really a deal because it's the same thing if I lost trial.
14                   He said life is life.

15   (<u>Id.</u> at 241.)  When asked whether it made sense to her that the prosecutor would offer a plea deal

16   that contained a sentence that was actually less lenient than if she lost at trial, she explained that

17   she "trusted Jesse Ortiz" because "he knew way better than I knew."  (<u>Id.</u>)  However, petitioner

18   also testified that she also thought co-defendant Johnson, who actually shot the store clerk, could

19   get a sentence of less than life without parole if he was convicted.  (<u>Id.</u>)

20         Petitioner testified that her mother and grandmother told her not to accept the plea offer,

21   based on "the information that they had got about – from Jesse Ortiz about the life sentence not

22   really being a deal, and that there was no way a jury can find me guilty."  (<u>Id.</u> at 243.)  However,

23   she admitted she did not know what her relatives were actually told by Mr. Ortiz.  (<u>Id.</u>)

24         Petitioner was asked about a statement made by the prosecutor in open court to the effect

25   that he "spoke with Miss Holmes' grandmother and mother and told them about, just from a

26   human point of view, she runs the risk of being convicted of life without parole."  (<u>Id</u> at 248.)

27   Specifically, petitioner was asked whether at that point she had "any concerns" that if she was

28   convicted at trial, she would receive a sentence of life without parole.  Petitioner responded,

No.  Because Jesse Ortiz had told me that I would probably get the same thing as from the deal that they were offering, so it wasn't a deal.

And from my understanding, I would rather – I had – at that time I thought that if they were going to offer me 16 to life, and I was going to get somewhere between 16 to life and life without parole, I might as well just take my chances because it's not a deal to me.  It wasn't a deal from how Jesse Ortiz had explained it to me.

(Id. at 249.)  She believed that if she was convicted, she could "get something less than life without parole, you could still get perhaps the same as the offer on the deal, 16 to life." (Id. at 250.)  She testified it was her understanding that if she was convicted after a trial, she could still receive a sentence of less than life without the possibility of parole.  (Id. at 252-53.)  She testified that her understanding in this regard came from "my own mind."  (Id. at 253.)

Petitioner testified that, based on her conversations with other inmates, she believed that if she accepted the offer of sixteen years to life she would "get out within 16, maybe 20 years."  (Id. at 255.)  She believed that "I had to do the whole 16 years, and then afterwards the parole will see if I was suitable or not."  (Id.)  She also realized that even if she was sentenced to sixteen years to life, she could still "end up staying in prison for [her] entire life."  (Id.)  She understood that there was a risk she could spend the rest of her life in prison if she accepted the plea offer for sixteen years to life, and also if she was convicted after a trial and received a sentence of life without the possibility of parole.  (Id. at 255-56.)

Petitioner testified that she believed life without the possibility of parole was her "maximum sentence."  (Id. at 257.)  She believed there was "room to move around."  (Id.)  She did not remember hearing anyone in the courtroom say that life without the possibility of parole was the "maximum sentence," but "they didn't say it was the mandatory sentence either."  (Id.)  She also repeated her testimony that Ortiz told her the sentence could be "the same as the plea, which is life."  (Id.)  Petitioner testified that Ortiz never told her that she would "absolutely, positively be sentenced to life without possibility of parole if you go to trial and lose."  (Id. at 272.)

Petitioner denied that she asked Ortiz to explain the meaning of "life" only with respect to the offer of sixteen years to life.  Specifically, the following colloquy occurred:

Q. And Mr. Ortiz testified that when he explained that life is life, it was in the context of explaining to you what life meant in terms of a 16 to life. That you asked about: Well, what does life mean? And he says: Well, life means you could spend the rest of your life in prison, life is life.

You heard him say that, right?

A. Well, I heard him say concerning the 18 to life sentence.

* * *

He did not say that concerning . . . the 16 to life sentence. He remembers that conversation happening on the 18 to life sentence.

Q. Do you remember him saying that in the context of the 18 to life sentence? You asked him: What does life mean?

A. No, I did not. I asked him – I didn't even ask him anything when the 16 to life offer was happening. I had conveyed to him my thoughts about actually taking the deal, and that's when he told me that life is life and that that is not a deal.

Q. And when the offer was 18 to life, you never asked him: Well, what does life mean in the context of that offer?

A. No.

(Id. at 258.)

When asked what Ortiz told her about "parole and the parole board," petitioner testified that Ortiz did not say "it will be up to the parole board if they let me out within so many years." (Id. at 282.) Rather, "what he said was that nowadays nobody is getting out with a life sentence in front of the parole board." (Id.) It was in that context that Ortiz said "life is life." (Id.) In other words, Ortiz stated that "with this 16 to life, the problem from your perspective could be that the parole board is not letting anyone out who has a life sentence" and that she "could be in prison for life even under this deal." (Id. at 283.) She believed this "to a certain extent," but she "still had hope." (Id. at 290.)

Petitioner was asked again about the prosecutor's statements to the effect that if she were convicted, she would run the risk of receiving a sentence of life without the possibility of parole. (Id. at 287.) She understood those statements to mean that "it carries life without parole, and yes, I understood it to be that it meant anywhere to life without parole." (Id.) She explained her understanding of the difference between her sentence if she accepted the plea offer and her

18

1   sentence if she were convicted, as follows: ". . . one was like a permanent solution, and then

2   another one was kind of fixed because it could be – if I pled guilty, I would get 16 years to life.

3   But if I took it to trial, I could get anywhere up to life without." (<u>Id.</u> at 288.) She also understood

4   that if she pled guilty she was not going to receive a sentence of life without parole and that she

5   might "get out." (<u>Id.</u>) Petitioner stated that "in [her] mind" there was no "difference in the

6   potential outcomes between pleading guilty and going to trial," even though she understood that if

7   she pled guilty she could not get life without the possibility of parole. (<u>Id.</u> at 289.) She

8   explained, "I saw it as – I had it in my mind, when Jesse Ortiz had told me I would get the same

9   thing if I lost trial, so I figured that I would probably get in between, which was 25." (<u>Id.</u>)

10       Petitioner understood that her performance in prison might allow her to be released,

11   regardless of whether she accepted the government's plea offer or was convicted after a trial. (<u>Id.</u>

12   at 290.) She stated that Ortiz "made it seem like he had a good case," and that she would

13   "probably get the 16 to life if I lost trial." (<u>Id.</u>) In other words, even though Ortiz told her that

14   she ran the risk of getting a sentence of life without the possibility of parole, and even though the

15   prosecutor had stated essentially the same thing in open court, she still believed that if she were

16   convicted after trial of special circumstance murder, she could get the same sentence she would

17   have gotten if she had pled guilty. (<u>Id.</u> at 291.) This belief was based on petitioner's

18   "understanding from Jesse Ortiz and our conversations." (<u>Id.</u>)

19       Petitioner testified that after the jury came back with guilty verdicts she still believed that

20   she might get a sentence of "16 to life." (<u>Id.</u> at 260.) She stated that the first time she realized

21   she was not going to get "16 to life" was when the judge told her "it was a mandatory life without

22   parole sentence." (<u>Id.</u>) She was surprised that she received a sentence of life without the

23   possibility of parole. (<u>Id.</u>) She knew that sentence was "a possibility," but she "didn't know that

24   it was the only choice that I got." (<u>Id.</u> at 261.) However, she didn't question Ortiz about her

25   sentence or ask him why she received such a sentence, nor did she tell the court she had been

26   misled about her sentence. (<u>Id.</u> at 261-62.) It didn't occur to her to do so. (<u>Id.</u> at 262.) When

27   asked whether, at any point, she told Mr. Ortiz that "he had misled you, or how could this have

28   happened, you told me I was going to get a different sentence, how did I get mandatory life

1   without possibility of parole," petitioner answered "no." (Id. at 280, 281.)

2      Petitioner didn't remember whether she spoke to Ortiz after she was sentenced. (Id. at

3   265-66.) She told her mother and grandmother a couple of years after trial that she felt she had

4   been misled by Ortiz. (Id. at 267.) She "didn't understand that he really actually misled me until

5   a couple of years after." (Id. at 268.) Even though she found out for the first time at the

6   sentencing proceedings that her sentence of life without parole was mandatory, contrary to what

7   Ortiz had told her, she did not realize he had misled her until a couple of years later because "I

8   wasn't so focused on him. I was focused on me." (Id. at 269.) It took petitioner until about a

9   year and a half after the sentencing proceedings, when her appellate counsel told her to write

10  down what had happened during her trial, that "it finally sunk in that he had given [her] bad

11  advice" and misled her. (Id. at 269, 270.) "That was the first time [she] actually thought about

12  everything. . . ." (Id. at 269.) However, petitioner did not have any correspondence to or from

13  her appellate attorney raising "these issues or concerns about what Mr. Ortiz told her." (Id. at

14  281.)

15      **B. Applicable Legal Standards**

16      The applicable legal standards for a claim of ineffective assistance of counsel are set forth

17  in Strickland v. Washington, 466 U.S. 668 (1984). To succeed on a Strickland claim, a defendant

18  must show that (1) his counsel's performance was deficient and that (2) the "deficient

19  performance prejudiced the defense." Id. at 687. Counsel is constitutionally deficient if his or

20  her representation "fell below an objective standard of reasonableness" such that it was outside

21  "the range of competence demanded of attorneys in criminal cases." Id. at 687–88 (internal

22  quotation marks omitted). "Counsel's errors must be 'so serious as to deprive the defendant of a

23  fair trial, a trial whose result is reliable.'" Harrington v. Richter, 562 U.S. 86, 114 (2011)

24  (quoting Strickland, 466 U.S. at 687). Prejudice is found where "there is a reasonable probability

25  that, but for counsel's unprofessional errors, the result of the proceeding would have been

26  different." Strickland, 466 U.S. at 694.

27      The Strickland standards apply to claims of ineffective assistance of counsel involving

28  counsel's advice offered during the plea bargain process. Missouri v. Frye, 132 S. Ct. 1399

1    (2012); Lafler v. Cooper, 132 S. Ct. 1376 (2012); Padilla v. Kentucky, 559 U.S. 356 (2009); Hill

2    v. Lockhart, 474 U.S. 52, 58 (1985); Nunes v. Mueller, 350 F.3d 1045, 1052 (9th Cir. 2003).

3    "During plea negotiations defendants are 'entitled to the effective assistance of competent

4    counsel.'"  Lafler, 132 S. Ct. at 1384 (quoting McMann v. Richardson, 397 U.S. 759, 771 (1970).

5    "A defendant has the right to make a reasonably informed decision whether to accept a plea

6    offer."  Turner v. Calderon, 281 F.3d 851, 880 (9th Cir. 2002) (citations omitted).  Trial counsel

7    must give the defendant sufficient information regarding a plea offer to enable him to make an

8    intelligent decision.  Id. at 881.  "[W]here the issue is whether to advise the client to plead or not

9    'the attorney has the duty to advise the defendant of the available options and possible

10   consequences' and failure to do so constitutes ineffective assistance of counsel."  United States v.

11   Blaylock, 20 F.3d 1458, 1465 (9th Cir. 1994) (quoting Beckham v. Wainwright, 639 F.2d 262,

12   267 (5th Cir.1981)).

13        A mere inaccurate prediction of a sentence, standing alone, does not constitute ineffective

14   assistance of counsel.  Iaea v. Sunn, 800 F.2d 861, 865 (9th Cir. 1986).  Only "the gross

15   mischaracterization of the likely outcome . . . , combined with the erroneous advice on the

16   possible effects of going to trial, falls below the level of competence required of defense

17   attorneys."  Id. at 865 (citations omitted).  Counsel is not "required to accurately predict what the

18   jury or court might find."  Turner, 281 F.3d at 881.  Nor is counsel required to "discuss in detail

19   the significance of a plea agreement," give an "accurate prediction of the outcome of [the] case,"

20   or "strongly recommend" the acceptance or rejection of a plea offer.  Id.  The relevant question is

21   not whether "counsel's advice [was] right or wrong, but . . . whether that advice was within the

22   range of competence demanded of attorneys in criminal cases."  McMann, 397 U.S. at 771.

23        In order to show prejudice in the context of plea offers, "a defendant must show the

24   outcome of the plea process would have been different with competent advice."  Lafler, 132 S.

25   Ct. at 1384.  In cases where trial counsel's defective advice caused the defendant to reject a plea

26   offer and proceed to trial, prejudice is demonstrated where "but for the ineffective advice of

27   counsel there is a reasonable probability that the plea offer would have been presented to the

28   court (i.e., that the defendant would have accepted the plea and the prosecution would not have

1    withdrawn it in light of intervening circumstances), that the court would have accepted its terms,

2    and that the conviction or sentence, or both, under the offer's terms would have been less severe

3    than under the judgment and sentence that is fact were imposed." Id. at 1385.

4        **C. Analysis**

5        As explained above, the Ninth Circuit directed this court to hold an evidentiary hearing to

6    determine whether petitioner's trial counsel informed her that if she was convicted of special

7    circumstance murder she would receive a "mandatory" sentence of life without the possibility of

8    parole. (ECF No. 46 at 10.) The Ninth Circuit concluded that the record did not reflect the

9    content of counsel's advice to petitioner and, therefore, did not show that petitioner "properly

10   understood the plea offer" or "understood the advantages of the plea." (Id. at 9.) The court also

11   noted that petitioner alleged her trial counsel told her the sentence she would receive under the

12   plea offer was "functionally the same" as the sentence that would be imposed if she were

13   convicted after a trial, and that this advice, if given, was "incorrect." (Id. at 8.) Whether trial

14   counsel's trial strategy was ineffective because he had a "flawed understanding of the case," or

15   whether counsel should have strongly advised petitioner to accept the plea offer, is not before this

16   court on remand. (Id. at 9 n.6.)

17       As set forth above, petitioner's trial counsel testified that he told petitioner if she lost at

18   trial, "she would get life without parole." (ECF No. 98 at 35.) He also told petitioner that if she

19   was found guilty of a "special circumstance," there were only two potential punishments: "death,

20   which they were not seeking," and "the only other option would be life without the possibility of

21   parole." (Id. at 46.) "And those were the only two options." (Id. at 158, 181.) Counsel did not

22   think he used the word "mandatory" when discussing petitioner's sentence with her. (Id. at 49.)

23   However, he told her that "if she went to trial and lost, she would be sentenced to life without the

24   possibility of parole." (Id. at 44, 45.)

25       With regard to the statement "life is life," Ortiz explained that when he was discussing the

26   prosecution's plea offer with petitioner she asked what the words "to life" meant. (Id. at 159.)

27   Ortiz told petitioner the words meant "life is life in prison," and "life means life." (Id. at 154,

28   160.) Ortiz also explained to petitioner that she could spend the rest of her life in prison under the

1   plea agreement unless the parole board decided she was eligible for parole after sixteen years.

2   (Id. at 160.)

3        Petitioner testified that Ortiz told her if she was convicted of special circumstance murder

4   her sentence could be "life without parole or the death penalty." (Id. at 208.) She agreed that

5   Ortiz told her she "faced the death penalty and life without possibility of parole," and that he did

6   not mention any other penalties that the special circumstance charge carried. (Id. at 237-38.)

7   However, she testified that Ortiz did not tell her that sentence would be "mandatory." (Id. at

8   208.) Petitioner also testified that, notwithstanding what Ortiz told her, she still believed and was

9   hopeful that she could receive a sentence of less than life without parole if she were convicted

10   after a trial.

11        After carefully reviewing the testimony received at the evidentiary hearing and assessing

12   the credibility of the witnesses, this court finds that Ortiz told petitioner, and she understood, that

13   if she were convicted of special circumstance murder the only sentence she could receive was life

14   without the possibility of parole. The court makes this finding even though Ortiz did not use the

15   word "mandatory." Petitioner testified at the evidentiary hearing that the first time she realized a

16   sentence of life without parole was "mandatory" was when the sentencing judge told her "it was a

17   mandatory life without parole sentence." (ECF No. 98 at 260.) However, neither the sentencing

18   judge nor the prosecutor used the word "mandatory" to describe her sentence. Rather, they

19   explained it much as Ortiz had: that the two sentencing options available in this case, given the

20   verdict on the special circumstance allegation, were the death penalty or life without parole.

21   (Reporter's Transcript on Appeal (RT) at 4208, 4210.) Petitioner has not explained why she

22   didn't understand the mandatory nature of her sentence when Ortiz explained it, but did

23   understand it when explained in essentially the same terms in the trial court. Further, Ortiz's

24   testimony that he told petitioner she would receive a sentence of life without the possibility of

25   parole if she was convicted was not confusing, equivocal, or unclear. Both petitioner and Ortiz

26   testified that Ortiz told petitioner if she were convicted of special circumstance murder she would

27   be facing life without parole or the death penalty. They also agreed that Ortiz did not

28   communicate any other options in terms of her sentence if she were convicted of special

1   circumstance murder.

2          As set forth above, petitioner testified she did not understand that the only penalty she

3   would face if she were convicted was life without the possibility of parole.  Rather, she believed

4   that she "could get anywhere between nothing to life without parole."  (Id. at 240.)  Petitioner

5   also stated that she believed she could possibly receive a sentence of between sixteen years and

6   life, or maybe 20 or 25 years, and that she was hoping for a sentence of 25 years.  However, she

7   acknowledged that this understanding was "in her own mind."  (Id. at 253.)  There was no

8   credible testimony that Ortiz told petitioner she could receive a sentence of less than life without

9   parole if she were convicted of special circumstance murder.

10         Petitioner also testified that Ortiz told her she would get the same sentence whether she

11  accepted the plea offer or was convicted after a trial.  In other words, Ortiz told her that "life is

12  life."  However, Ortiz explained that his statement "life is life" came up in a conversation about

13  the plea offer, wherein Ortiz told petitioner that sixteen years "to life" meant that she could spend

14  the rest of her life in prison if the parole board failed to find her suitable for parole.  Ortiz

15  reinforced that concept by telling petitioner that the parole board was not "letting anyone out who

16  has a life sentence."  (Id. at 255, 258.)  As a result, a life sentence under the plea offer could mean

17  she would actually spend her entire life in prison.  On the other hand, petitioner testified she

18  understood that under the plea offer she could eventually be released if she was found suitable for

19  parole, whereas if she received a sentence of life without the possibility of parole, she would

20  never be released from prison.  As noted by the Ninth Circuit, if Ortiz had told petitioner there

21  was no difference in the meaning of the word  "life" between a sentence of "life without the

22  possibility of parole" and a sentence of "sixteen years to life," his performance would have been

23  deficient.  (ECF No. 46 at 8.)  See also Martinez v. Felker, No. CV 04-2960-MMM (MAN), 2009

24  WL 393166, at *1 (C.D. Cal. Feb. 13, 2009) ("counsel's advice to petitioner that there was no

25  functional difference between a sentence of life without the possibility of parole and a parole-

26  eligible life sentence was grossly erroneous").  However, this court finds that Ortiz did not tell

27  petitioner she would receive the same sentence if she pled guilty or was convicted after a trial.

28  /////

1    The court concludes that petitioner chose to reject the plea offer and proceed to trial, with

2    the knowledge that if she were convicted she would receive a sentence of life without the

3    possibility of parole.  Any other "understanding" that petitioner may have had about her sentence

4    was based on wishful thinking.  The court notes that at the sentencing proceedings Ortiz argued

5    that the trial court should strike the special circumstance finding on the grounds that a sentence of

6    life without the possibility of parole would constitute cruel and unusual punishment as applied to

7    petitioner.  (RT at 4202-03, 4211.)  Petitioner's hope that this argument would succeed may have

8    been the basis for her testimony that she believed she might get a sentence of between 16 and 25

9    years in prison even though she had been convicted of special circumstance felony murder.

10    The court's conclusion that petitioner understood the sentence she was going to receive is

11    reinforced by petitioner's testimony that she did not express surprise or raise questions about her

12    sentence of life without parole, either at the sentencing proceedings or with Ortiz after she was

13    sentenced.  Petitioner testified it did not occur to her to ask Ortiz why he had allegedly misled her

14    about her sentence.  (Id. at 280-81.)  Further, although petitioner testified she told her appellate

15    counsel, a year and a half after her sentencing proceedings, that she believed Ortiz had

16    misrepresented her sentence (id. at 269, 270), petitioner did not introduce documentary evidence

17    of any such communication at the evidentiary hearing.  There is also no evidence that Ortiz had

18    any doubts about whether petitioner understood what he was telling her about her sentence if she

19    went to trial and was convicted.  In light of the evidence presented at the evidentiary hearing,

20    petitioner has failed to demonstrate that her trial counsel rendered deficient performance in failing

21    to advise her of the risk that if she rejected the plea offer and lost after a trial, she would receive a

22    mandatory sentence of life without the possibility of parole.

23    Assuming arguendo that Ortiz rendered deficient performance in connection with his

24    advice to petitioner about the risk of rejecting the plea offer, petitioner has failed to show

25    prejudice.  The testimony at the evidentiary hearing reflects that Ortiz advised petitioner,

26    correctly, that it was possible she could end up serving her entire life in prison even if she

27    accepted the plea offer.  Thus, she could be in prison for life under both scenarios.  Ortiz also

28    advised petitioner, and believed, that she had a plausible defense that could be presented at trial.

1  Petitioner's family, on whom she relied, did not want her to take the plea offer.  The evidence

2  reflects and this court concludes that after being so advised and consulting with her family

3  petitioner decided to take her chances of being acquitted after a trial and rejected the plea offer,

4  even though she knew she would receive a sentence of life without parole if she were convicted.

5  Under these circumstances, petitioner has failed to demonstrate she would have accepted the plea

6  offer of sixteen years to life even if she were advised that she faced a mandatory sentence of life

7  without parole.

8  **IV. Conclusion**

9       Accordingly, for the foregoing reasons, IT IS HEREBY RECOMMENDED that

10  petitioner's remanded claim of ineffective assistance of counsel in the course of plea negotiations

11  be denied.

12       These findings and recommendations are submitted to the United States District Judge

13  assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days

14  after being served with these findings and recommendations, any party may file written

15  objections with the court and serve a copy on all parties.  Such a document should be captioned

16  "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

17  shall be served and filed within fourteen days after service of the objections.  Failure to file

18  objections within the specified time may waive the right to appeal the District Court's order.

19  Turner v. Duncan, 158 F.3d 449, 455 (9th Cir. 1998); Martinez v. Ylst, 951 F.2d 1153 (9th Cir.

20  1991).  In his objections petitioner may address whether a certificate of appealability should issue

21  in the event he files an appeal of the judgment in this case.  See Rule 11, Federal Rules Governing

22  Section 2254 Cases (the district court must issue or deny a certificate of appealability when it

23  enters a final order adverse to the applicant).

24  Dated:  November 16, 2016

25

26                                                 KENDALL J. NEWMAN
                                                   UNITED STATES MAGISTRATE JUDGE
27

28  holmes2710.hc